**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CURTIS LEE MORRISON,
*Plaintiff-Appellant*,

v.

MARK PETERSON,
*Defendant-Appellee*,

THE ATTORNEY GENERAL OF THE
STATE OF CALIFORNIA,
*Intervenor*.

No. 13-15675

D.C. No.
5:11-cv-01896-
LHK

OPINION

Appeal from the United States District Court
for the Northern District of California
Lucy H. Koh, District Judge, Presiding

Argued and Submitted
November 16, 2015—San Francisco, California

Filed December 15, 2015

Before: DIARMUID F. O'SCANNLAIN and MILAN D.
SMITH, JR., Circuit Judges, and BRIAN M. MORRIS,[*]
District Judge.

Opinion by Judge Milan D. Smith, Jr.

---

[*] The Honorable Brian M. Morris, District Judge for the U.S. District Court for the District of Montana, sitting by designation.

## SUMMARY[**]

### Prisoner Civil Rights

The panel affirmed the district court's dismissal on the merits of an action brought by a California state prisoner challenging the constitutionality of California Penal Code § 1405, which provides a mechanism for those convicted of crimes to obtain DNA testing of evidence where such testing is potentially relevant to proving innocence.

The panel first rejected plaintiff's contention that the promise held out by § 1405 is illusory, noting that the available judicial decisions and statistics did not suggest that § 1405 in practice bars access to postconviction DNA testing.

The panel next addressed plaintiff's facial challenge to section 1405(f)(5), which requires a movant to demonstrate that the requested DNA testing results would raise a reasonable probability, that in light of all the evidence, the verdict or sentence would have been more favorable if the results of DNA testing had been available at the time of the conviction. The panel held that plaintiff did not show that § 1405's "reasonable probability" requirement violated any recognized principle of fundamental fairness or went beyond what the Supreme Court approved in *District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52 (2009). The panel further held that the chain of custody requirement in § 1405(f)(2) did not transgress any recognized principle of fundamental fairness in operation.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that even though a portion of plaintiff's challenge to the statute was "as applied," the challenge was not barred by the *Rooker-Feldman* doctrine because plaintiff sought to invalidate the DNA testing statute on federal constitutional grounds. Addressing the "as applied" challenge, the panel held that a review of a § 1405 petition by a judge other than the trial judge does not violate due process.

---

## COUNSEL

Joshua S. Lipshutz (argued), Gibson Dunn & Crutcher, San Franciso, California, for Plaintiff-Appellant.

Christopher B. Whitman (argued), Deputy County Counsel, Sharon L. Anderson, County Counsel, County of Contra Costa, Martinez, California, for Defendant-Appellee.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Acting Senior Assistant Attorney General, Gregory A. Ott and Michael Chamberlain, Deputy Attorneys General, State of California, San Francisco, California, for Intervenor.

---

## OPINION

M. SMITH, Circuit Judge:

Prisoner Curtis Lee Morrison made two unsuccessful motions in California State court for post-conviction DNA testing under California Penal Code § 1405. He then brought this action, seeking relief under 42 U.S.C. § 1983. The district court dismissed the action on the merits.

On appeal, the court appointed pro bono counsel, who provided valuable assistance to Morrison and the court. Morrison pursues a facial challenge to two provisions of the statute, and an as-applied challenge to a third. We reject those challenges, and affirm the decision of the district court.

## FACTS AND PRIOR PROCEEDINGS

### I. Morrison's Conviction for Murder and Subsequent Habeas Litigation

We previously summarized the facts of Morrison's underlying conviction as follows:

> On April 21, 1973, Morrison and his nephew were driving on Highway Four in a pickup truck when the drive shaft of the truck broke and the vehicle coasted to a stop. While his nephew left to get help, Morrison tried to remove the truck's U-bolts in preparation for installing a new drive shaft. Martinez Police Officer Thomas Tarantino stopped by the side of the highway to see if Morrison needed help.
>
> Several witnesses testified as to what happened after Officer Tarantino stopped to help Morrison. After an initial conversation, Officer Tarantino frisked Morrison. The two men were next seen wrestling on the ground, after which Morrison threw Officer Tarantino onto the highway. Sylvia Young testified that she saw Morrison holding what appeared to be a police service revolver. Cheryl Balsdon

testified that Morrison [waved] a gun in the air and pointed it at the officer's head. William Boydston saw the officer and Morrison struggling, heard three shots, and saw the officer fall. This witness saw the officer stand and further struggle with Morrison until the officer fell again. Boydston heard one more shot.

Officer Tarantino died at the hospital from gunshot wounds to his head and stomach. The officer's revolver was found on a hillside at the scene. The revolver contained two unfired bullets and four cartridge cases.

Morrison's driver's license was found in the officer's uniform shirt pocket, and Morrison's .22 caliber gun was found in the officer's right front pants pocket. Officer Tarantino had a habit of putting the license of a person in custody in his shirt pocket and of putting any evidence taken by him in his right front pants pocket. Morrison was an ex-felon on parole.

*Morrison v. Estelle*, 981 F.2d 425, 426–27 (9th Cir. 1992).

At his trial, Morrison testified to a different version of the facts: that a few seconds after Officer Tarantino arrived, and while Morrison was under his truck, two men arrived on a motorcycle. They asked for directions to Pittsburg, and both Morrison and the officer gave them directions. The two men then started arguing with each other, and the officer asked one of them to come over to the truck. There was a scuffle,

and a few seconds later, shots were fired. Morrison had started to come out from under the truck, but scooted back underneath when he heard gunfire. After the two men left, Morrison tried to help the officer, and less than a minute later, another officer arrived and arrested Morrison.

The jury rejected Morrison's account, and convicted him of first-degree murder and related offenses. The California Court of Appeal affirmed. *Morrison*, 981 F.2d at 427. The California Supreme Court denied Morrison's state habeas petition. *Id*. The federal district court denied Morrison's federal habeas petition. *Id*. Our court affirmed that denial. *Id*. at 429. We denied Morrison's application to file a second or successive habeas corpus petition.

## II. Morrison's State California Penal Code § 1405 Litigation

California Penal Code § 1405 provides a mechanism for those convicted of crimes to obtain DNA testing of evidence where such testing is potentially relevant to proving innocence. In 2006, Morrison successfully requested that counsel be appointed to prepare a motion seeking DNA testing pursuant to § 1405. The parties briefed the motion, and the judge read the entire transcript of the trial and heard oral argument. Morrison requested DNA testing of (1) the blood on Officer Tarantino's pants and shoes, (2) the swabs of the handgun taken from Officer Tarantino's pocket, (3) the materials collected from the surface of Officer Tarantino's gun, and (4) the knit hat recovered from the scene. At the hearing, Morrison's counsel also requested testing of the tape on the handgun taken from Officer Tarantino's pocket.

The court concluded that any test results would not raise a reasonable probability of a more favorable verdict because Morrison's story was at odds with every eyewitness account, inconsistent with the physical evidence, and did not "make any sense." Morrison, again represented by counsel, petitioned for a writ of mandate directing the court to grant the motion for testing, which the California Court of Appeal denied after full briefing.

In 2010, Morrison filed a second § 1405 motion, this time pro se. The court denied the motion, holding that Morrison failed to show that the evidence was material to the identification of the perpetrator. Morrison filed another writ petition, which the California Court of Appeal denied.

## III.    Morrison's Federal Challenge to § 1405

In 2011, Morrison filed this case, seeking relief under 42 U.S.C. § 1983. The district court dismissed the action on the merits based on *District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52 (2009). The district court held that Morrison's facial challenge to the statute failed because "California provides more generous procedural protections than the Alaska scheme that was found to satisfy due process in *Osborne.*"

Further, as to Morrison's challenge to the statute "as applied to this plaintiff and or construed in this case by the California Courts" "because no where in Section 1405 does it take into account eye witness testimony that is contradicted by physical evidence and undisputed documents," the district court held that under *Skinner v. Switzer*, 562 U.S. 521 (2011), such claims for review of state court rulings cannot be brought in a federal civil rights action.

This appeal followed. Next, we appointed pro bono counsel for Morrison. We also granted the State of California's opposed motion to intervene. Morrison asks the court to reverse the dismissal and grant his motion for summary judgment, or at least remand for discovery on how § 1405 operates in practice. This court has previously rejected three challenges to § 1405 in unpublished decisions: *Turner v. Dumanis*, 415 F. App'x 831, 832 (9th Cir. 2011), *Jackson v. Cooley*, 348 F. App'x 245 (9th Cir. 2009), and *Harrison v. Dumanis*, 343 F. App'x 218 (9th Cir. 2009). However, no published Ninth Circuit cases have done so.

## STANDARD OF REVIEW

The dismissal of a complaint for failure to state a claim is reviewed de novo. *Stone v. Travelers Corp.*, 58 F.3d 434, 436–37 (9th Cir. 1995). The denial of a motion for summary judgment is also reviewed de novo. *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 777 (9th Cir. 2014).

## DISCUSSION

### I.  Morrison's Facial Challenges to § 1405's "Reasonable Probability" and Chain of Custody Requirements

#### A.  Legal Standard for Facial Challenges

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). While a challenger must therefore show that a "law is unconstitutional in all of its applications," *Washington State Grange v. Washington State*

*Republican Party*, 552 U.S. 442, 449 (2008), when assessing whether a statute meets this standard, courts consider only applications of the statute in which it actually authorizes or prohibits conduct. *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2451 (2015).

## B. The Nature of Morrison's Liberty Interest and Its Attendant Due Process Rights

To determine what process, if any, is due, a court must consider the nature of a prisoner's liberty interest in proving innocence even after a fair trial resulted in a conviction. *Osborne*, 557 U.S. at 67. California does not dispute that, as in *Osborne*, Morrison has "a liberty interest in demonstrating his innocence with new evidence under state law." *Id*. That is because California law provides a right to be released from custody pursuant to a writ of habeas corpus when there is no legal cause for imprisonment. Cal. Penal Code § 1485; *In re Weber*, 523 P.2d 229, 243 (Cal. 1974).

That "state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right." *Osborne*, 557 U.S. at 68 (quoting *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 463 (1981)). However, "[a] criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man. . . . The State accordingly has more flexibility in deciding what procedures are needed in the context of postconviction relief." *Id*. at 68–69. For those individuals with that narrowed liberty interest, due process does not "dictat[e] the exact form" of post-conviction assistance a State must provide. *Id*. at 69 (quoting *Pennsylvania v. Finley*, 481 U.S. 551, 559 (1987)).

In such circumstances, the question is whether the state's procedures "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," or "transgress[] any recognized principle of fundamental fairness in operation." *Id.* (quoting *Medina v. California*, 505 U.S. 437, 446, 448 (1992)). In sum, "[f]ederal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided." *Id.*

In *Osborne*, the Supreme Court rejected a challenge to Alaska's procedures allowing prisoners an opportunity to vindicate their state right to post-conviction relief based on DNA evidence. Alaska provided a "substantive right to be released on a sufficiently compelling showing of new evidence that establishes innocence." *Id.* at 70. Alaska caselaw established that persons seeking access to DNA evidence must demonstrate that the evidence is newly available, has been diligently pursued, and is sufficiently material. *Id.* And while the Alaska state courts had not conclusively answered the question, the Alaska Court of Appeals suggested that under the Alaska Constitution, DNA testing could be provided in an appropriate case even where the applicant cannot satisfy the statutory requirements for general post-conviction relief. *Id.*

*Osborne* rejected the argument that there was a freestanding substantive due process right to DNA evidence "untethered from the liberty interests [a claimant] hopes to vindicate with it." *Id.* at 72. And it found nothing inadequate about the Alaska procedures, which provided "a substantive right to be released on a sufficiently compelling showing of new evidence that establishes innocence." *Id.* at 70. Like California's § 1405, Alaska's procedure required a showing

of sufficient materiality. However, Alaska, unlike California, also required the evidence to be "newly available" and have been "diligently pursued." *Id.*

"*Osborne* severely limits the federal action a state prisoner may bring for DNA testing. *Osborne* rejected the extension of substantive due process to this area, and left slim room for the prisoner to show that the governing state law denies him procedural due process." *Skinner*, 562 U.S. at 525 (internal citations omitted).

## C. Morrison's Statistics Do Not Suggest a Problem

Before turning to the asserted doctrinal deficiencies in the statute, Morrison attempts to demonstrate as a general factual matter that the promise held out by § 1405 is illusory. Morrison argues that § 1405's requirements are so onerous as to effectively leave access to post-conviction DNA evidence to the discretion of prosecutors, since Morrison, conducting an electronic docket search of the California Supreme Court, California Courts of Appeal, and 14 of the 58 Superior Courts in California, could locate only three cases granting a § 1405 motion since the statute was enacted in 2000: *Jointer v. Superior Court of Orange County*, 217 Cal. App. 4th 759 (2013), *In re Antilla*, 176 Cal. App. 4th 622 (2009), and *In re Brown*, No. E054403, 2011 WL 5320650 (Cal. Ct. App. Nov. 4, 2011).[1]

---

[1] *In re Brown*, 2011 WL 5320650, is actually a court of appeal decision appointing counsel pursuant to § 1405, not granting a motion for DNA testing. Morrison may have intended to cite to *Brown v. Superior Court*, No. B218037, 2010 WL 1633953 (Cal. Ct. App. Apr. 23, 2010), which granted the petitioner's writ of mandate to order DNA testing. *Id.* at *4.

We are not persuaded by these statistics, which lack context. The number three is meaningless as a numerator unless we know the denominator, and none of the parties to this appeal provide it, either for the courts searched by Morrison, or otherwise.

Our independent research yielded eight cases concerning or reflecting a decision on whether to grant post-conviction DNA testing. This includes the three cases identified by Morrison. Of the eight, DNA testing was finally denied only in two: *Richards v. Superior Court*, No. E060568, 2014 WL 6705550 (Cal. Ct. App. Nov. 26, 2014), and *Richardson v. Superior Court*, 183 P.3d 1199 (Cal. 2008). DNA testing was granted in six: *Jointer v. Superior Court*, 217 Cal. App. 4th 759 (2013), *Brown v. Superior Court*, No. B218037, 2010 WL 1633953 (Cal. Ct. App. Apr. 23, 2010), *In re Antilla*, 176 Cal. App. 4th 622 (2009), *Madden v. Superior Court*, No. B200652, 2008 WL 5178354 (Cal. Ct. App. Dec. 11, 2008),[2] *People v. Ceja*, No. B195208, 2008 WL 82467 (Cal. Ct. App. Jan. 9, 2008),[3] and *Rose v. Hudson*, 153 Cal. App. 4th 641 (2007).[4] Thus, tallying the available judicial decisions does not suggest that § 1405 in practice bars access to postconviction DNA testing.

---

[2] Testing was granted as a due process right even though petitioner did not meet the § 1405 procedural and notice requirements. *Madden*, 2008 WL 5178354, at *15.

[3] Testing confirmed that defendant was the perpetrator in one assault, after which the trial court denied testing as to three others. *Ceja*, 2008 WL 82467, at *1.

[4] Testing exonerated the defendant. *See generally* Susan Rutberg, *Anatomy of a Miscarriage of Justice: The Wrongful Conviction of Peter J. Rose*, 37 Golden Gate U. L. Rev. 7 (2010).

Similarly, Morrison argues that "the vast majority of prisoners who have obtained access to evidence for post-conviction DNA testing have done so with the consent of the prosecutor, not through Section 1405." To support this claim, Morrison cites survey data regarding the methods used by exonerees to obtain DNA testing reported in Brandon Garrett, *Convicting the Innocent: Exoneration*, http://www.law.virginia.edu/html/librarysite/garrett_exoner ation.htm (last visited Nov. 18, 2015). However, the cited data does not directly support Morrison's argument for two reasons. First, the data cited is nationwide, with no designation of which cases were in California. Second, the data does not discuss whether the DNA testing was in fact obtained through a motion. Instead, it only states that "prosecutors consented to DNA testing in 81 percent of cases in which information was obtained on the subject (170 of 210 cases) and opposed it in 19 percent (40 of 210 cases), with no information available in 40 cases."

The source does not provide the data necessary to know, even nationwide, what percentage of motions for testing are successful. It certainly does not give rise to the inference that there is a facial problem with California's § 1405.

Morrison also cites data indicating that only 3.5% of the 311 total DNA-related exonerations nationwide have occurred in California, while California has 8.5% of the United States prison population. *See* Innocence Project, The Cases: DNA Exoneree Profiles, http://www.innocenceproject.org/cases-false-imprisonment (last visited Nov. 18, 2015); U.S. Dep't of Justice, Prisoners in 2012 - Advance Counts, http://www.bjs.gov/content/pub/ pdf/p12ac.pdf (last visited Nov. 18, 2015). However, there could be many reasons for that disparity other than the

asserted illusory nature of § 1405, including more careful than average work by the California prosecuting authorities and courts in the first instance.

Finally, the State notes that a number of California district attorneys proactively review convictions and offer DNA testing without the need for a § 1405 motion. *See* James Sterngold, *San Diego District Attorney Offering Free DNA Testing*, N.Y. Times, http://www.nytimes.com/2000/07/28/us/ san-diego-district-attorney-offering-free-dna-testing.html, Jul. 28, 2000 ("The San Diego County district attorney has begun a policy of offering free DNA testing to prison inmates who say they were wrongly convicted and would be exonerated by this increasingly common scientific method."); Marisa Gerber, *L.A. County D.A. To Create Unit To Review Wrongful-Conviction Claims*, L.A. Times, http://www.latimes.com/local/lanow/la-me-ln-conviction-review-unit-20150422-story.html, Apr. 22, 2015 (citing efforts by district attorneys in Yolo, Ventura, Santa Clara, and Los Angeles counties). These efforts may have further reduced the need to litigate § 1405 motions.

## D.  The "Reasonable Probability" Requirement Does Not Violate Due Process

Section 1405(f)(5) requires the movant to demonstrate that "[t]he requested DNA testing results would raise a reasonable probability that, in light of all the evidence, the convicted person's verdict or sentence would have been more favorable if the results of DNA testing had been available at

the time of the conviction."**[5]** The California Supreme Court has interpreted this requirement to mean that the movant must demonstrate "a reasonable chance and not merely an abstract possibility [ ] that the defendant would have obtained a more favorable result." *Richardson*, 183 P.3d at 1205. *Richardson* also instructed trial courts to "bear in mind that the question . . . is whether the defendant is entitled to develop potentially exculpatory evidence and not whether he or she is entitled to some form of ultimate relief such as the granting of a petition for habeas corpus based on that evidence." *Id*.

Because Morrison raises a facial challenge to § 1405(f)(5)'s reasonable probability requirement, he must "establish that no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745. This presents a difficult hurdle for Morrison, because "[w]here there is enough other incriminating evidence and an explanation for the DNA result, science alone cannot prove a prisoner innocent." *Osborne*, 557 U.S. at 62 (citing *House v. Bell*, 547 U.S. 518, 540–48 (2006)). As we noted in denying Morrison's habeas appeal, multiple witnesses observed Morrison commit the crime, and Morrison was apprehended immediately at the scene. *Morrison*, 981 F.2d at 426–27.

More generally, Morrison argues that it is unfair that a prisoner cannot make the reasonable probability showing where "a substantial amount of other evidence," *Richardson*, 183 P.3d at 1206, links the prisoner to the crime, because "[b]y definition, every prisoner who is seeking access to evidence for post-conviction DNA testing will have been

---

**[5]** Morrison's challenge concerns the 2005 version of § 1405; a revised version of the statute took effect in 2015. Unless otherwise indicated, citations to § 1405 are to the prior version.

found guilty on the basis of proof beyond a reasonable doubt." But far from announcing a standard higher than that established by the statute, the California Supreme Court's mention of a "substantial amount of other evidence" was merely a quotation of the trial court's language, which "in context, constitute[d] a finding that petitioner failed to establish the reasonable probability requirement." *Richardson*, 183 P.3d at 1206. Thus, *Richardson* did not substitute "a substantial amount of other evidence" for the statutory "reasonable probability" test.[6] And it does not violate due process for a court to evaluate what potential impact a negative DNA test could have.

Morrison also argues that § 1405(f)(5)'s "reasonable probability" requirement is more stringent than the requirements at issue in *Osborne*. There, the Alaska statute required that new evidence be "material," Alaska Stat. § 12.72.010(4) (2008), corresponding to § 1405(f)(4), and the Alaska caselaw avenue required a "demonstrable doubt concerning the defendant's identification as the perpetrator," corresponding to § 1405(f)(3). *Osborne*, 557 U.S. at 65.

---

[6] Morrison argues that the Legislature's 2014 revision to the statute addressing the "reasonable probability" standard highlights the infirmity of the earlier version. The revision, effective January 1, 2015, added a statement that "[i]n determining whether the convicted person is entitled to develop potentially exculpatory evidence, the court shall not decide whether, assuming a DNA test result favorable to the convicted person, he or she is entitled to some form of ultimate relief." Cal. Penal Code §1405(g)(5) (2015). However, this merely codifies what *Richardson* already held: that the question is "whether the defendant is entitled to develop potentially exculpatory evidence and not whether he or she is entitled to some form of ultimate relief." 183 P.3d at 1205.

Morrison argues that the additional "reasonable probability" requirement of § 1405(f)(5) goes beyond what the Supreme Court approved in *Osborne*. Not so. The Alaska constitutional caselaw test required that "scientific testing would likely be conclusive" on the issue of the defendant's identification as the perpetrator. *Osborne*, 557 U.S. at 65 (quoting *Osborne v. State*, 110 P.3d 986, 995 (Alaska Ct. App. 2005)). This is more restrictive, not less restrictive, than California's "reasonable probability" requirement. And the Alaska statutory pathway required a showing of "sufficient[]" materiality, *id*. at 70, which Morrison has not shown is sufficiently distinct from California's "reasonable probability" requirement. Indeed, California courts are required to "liberally apply the 'reasonable probability' standard to permit testing in questionable cases." *Jointer*, 217 Cal. App. 4th at 769. Section 1405(f)(5) therefore fits comfortably within the confines of *Osborne*.

In short, Morrison does not show that the "reasonable probability" requirement violates "any recognized principle of fundamental fairness." *Osborne*, 557 U.S. at 69 (quoting *Medina*, 505 U.S. at 448)).

### E. The Chain of Custody Requirement Does Not Violate Due Process

Morrison argues that "[i]t is unfair for Section 1405(f) to place the burden of proof [to establish the chain of custody] on the prisoner because the evidence necessary to meet that burden is solely in the hands of the government and Section 1405 does not provide any means of discovery by which the prisoner could potentially obtain that evidence." Morrison also argues that chain of custody issues traditionally go to weight, rather than admissibility, but that § 1405(f) treats

them as a threshold requirement, unlike the Alaska rules at issue in *Osborne*.

Section 1405(f)(2) requires the court to find that "[t]he evidence to be tested has been subject to a chain of custody sufficient to establish it has not been substituted, tampered with, replaced or altered in any material aspect." While Morrison argues that this unfairly placed the burden on him, his § 1405 motion was not denied on chain of custody grounds. The County notes that the prosecuting authority is required by law to retain biological evidence in connection with a criminal case. Cal. Penal Code § 1417.9(a). While neither the County nor the State so argues, it is possible that this itself could establish a prima facie showing of lack of tampering.

Further, when a chain of custody is challenged in California courts, the party offering the evidence need only show that "taking all the circumstances into account . . . it is reasonably certain that there was no alteration." *People v. Catlin*, 26 P.3d 357, 391 (Cal. 2001) (quoting *People v. Diaz*, 834 P.2d 1171, 1204 (Cal. 1992)). We previously observed that "[n]o California court has interpreted § 1405 as binding the Superior Court to preclude relief based on tampering," *Cooper v. Ramos*, 704 F.3d 772, 781 (9th Cir. 2012), and Morrison does not identify any such cases.[7] Accordingly, the

---

[7] Morrison again points to the state legislature's revision of the statute. Here, the legislature added a requirement that upon request of the convicted person, the court may order the prosecutor to make all reasonable efforts to obtain documents relevant to the chain of custody. Cal. Penal Code § 1405(c)(2) (2015). Again, this does not demonstrate that the pre-amendment text mandated the denial of § 1405 motions based on an unconstitutional catch-22 where the prisoner had to show something that only the prosecutor would know.

chain of custody requirement does not "transgress[] any recognized principle of fundamental fairness in operation." *Osborne*, 557 U.S. 52, 69 (internal quotation marks omitted).

## II. Morrison's As-Applied Challenge

### A. The *Rooker–Feldman* Doctrine Does Not Bar Morrison's As-Applied Challenge

Morrison argues that § 1405 is unconstitutional as applied in those cases, like his, where a petitioner's motion must be adjudicated by a judge who did not preside over the petitioner's original trial. "The *Rooker–Feldman* doctrine instructs that federal district courts are without jurisdiction to hear direct appeals from the judgments of state courts"; such review is only available in the United States Supreme Court. *Cooper*, 704 F.3d at 777. "The doctrine bars a district court from exercising jurisdiction not only over an action explicitly styled as a direct appeal, but also over the 'de facto equivalent' of such an appeal." *Id.* (quoting *Noel v. Hall*, 341 F.3d 1148, 1155 (9th Cir. 2003)).

However, if a plaintiff presents an independent claim in federal court, federal jurisdiction is not defeated by the fact that the parties litigated the "same or a related question" earlier in state court. *Skinner*, 562 U.S. at 522 (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 292–93 (2005)). *Rooker–Feldman* "is confined to cases of the kind from which [the doctrine] acquired its name: cases brought by state-court losers . . . inviting district court review and rejection of [the state court's] judgments." *Exxon*, 544 U.S. at 284.

Because Morrison does not seek an order that he be allowed DNA testing, but instead seeks to invalidate the DNA testing statute on federal constitutional grounds, his claim is not barred by *Rooker–Feldman*. That is so even though this portion of his challenge is "as applied." In challenging the application of the statute when a judge other than the trial judge evaluates the § 1405 petition, Morrison merely argues a defect that is not apparent from the face of the statute. While review by someone other than the trial judge does not occur in every case, it is a categorical issue not limited to the particulars of Morrison's situation. While that challenge ultimately lacks merit, as discussed in the following section, it is not barred by *Rooker–Feldman*.

**B.  Review of the § 1405 Petition by a Judge Other than the Trial Judge Does Not Violate Due Process**

Morrison argues that § 1405 is unconstitutional as applied when a judge other than the judge who conducted the trial rules on the motion. Section 1405(e) states that motions "shall be heard by the judge who conducted the trial." "[T]he legislature required convicted persons to bring section 1405 motions before the judge who presided over their trials . . . precisely because the trial judge is in the best position to make the reasonable probability determination." *Richardson*, 183 P.3d at 1207. However, the *Richardson* court also had no trouble—as is necessary in every appeal, to a greater or lesser extent depending on the standard of review—making its "own assessment of the evidence." *Id.*

Section 1405(e) also provides that the motion be assigned to a new judge when the trial judge is unavailable. Morrison contends that this renders the reasonable probability standard "especially problematic because a newly assigned judge is in

no position to weight the evidence from the trial against the potentially exculpatory DNA evidence."

This argument fails. The "problem" Morrison complains of is present in every appeal and every habeas case. A contrary rule would be impractical, as judges become unavailable for a variety of reasons, and § 1405 motions can be brought many years after a trial. Thus, assigning another judge to rule on a § 1405 motion where the trial judge is unavailable cannot "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," or "transgress[] any recognized principle of fundamental fairness in operation." *Osborne*, 557 U.S. at 69 (quoting *Medina*, 505 U.S. at 446, 448).

## CONCLUSION

The decision of the district court is affirmed. Each party shall bear its own costs.

**AFFIRMED**.